S. JONATHAN YOUNG
Law Offices of Williamson & Young, P.C.
P.O. Box 42245
Tucson, AZ  85733-2245
Telephone (520) 795-0525
State Bar No. 012598
jon@williamsonandyoung.com

ERIN M. CARRILLO
The Carrillo Law Firm, PLLC
23 N. Stewart Avenue
Tucson,AZ 85716
Phone: (520) 398-7369
State Bar No. 024613
erin@thecarrillolawfirm.com

Attorney for Defendant Cody James Martinez

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| Cody James Martinez,<br><br>          Petitioner,<br><br>      vs.<br><br>David Shinn, Director Arizona Department of Corrections, and Jeff Van Winkle, Warden, Arizona State Prison, and The Attorney General of the State of Arizona,<br><br>          Respondents. | No.:<br><br>PETITION FOR WRIT OF HABEAS CORPUS AND MOTION FOR STAY OF EXECUTION AND APPLICATION FOR APPOINTMENT OF COUNSEL<br><br>[CAPITAL CASE] |
| --- | --- |

# PETITION

Cody James Martinez, Arizona Prisoner No. 151281 is a prisoner in state custody under sentence of death in Arizona.  He is presently incarcerated in the Arizona State Prison, in Florence, Arizona.

1.  Mr. Martinez pled not guilty and was convicted after a trial to a jury and sentenced to death in the Pima County Superior Court No. CR-20031993 with Superior Court Judge Howard Fell presiding.  He was convicted of premeditated first degree murder, felony murder, and kidnapping on November 18, 2005.

2.  His convictions and death sentence were affirmed by the Arizona Supreme Court on July 25, 2008, in *State v. Cody James Martinez*, 218 Ariz. 421 (2008). Reconsideration was denied August 14, 2008.

3,  A petition for writ of certiorari to the United States Supreme Court was timely filed on August 22, 2008.  The United States Supreme Court denied certiorari review on November 3, 2008.

4.  The Arizona Supreme Court issued its Mandate on November 21, 2008.  It issued a Notice For Post-Conviction Relief on November 25, 2008.  It appointed Post-Conviction counsel on December 2, 2010.  Time is tolled from the filing of the Notice for Post-Conviction Relief was filed.  *Isley v. Ariz. Dep't of Corr.*, 383 F.3d 1054, 1056 (9th Cir. 2004) ("we hold that Isley's state petition was "pending" within the meaning of 28

U.S.C. § 2244(d)(2) and he was entitled to tolling from the date when the Notice was filed.").

5.   Mr. Martinez's petition for postconviction relief was granted in part and denied in part by the state trial court on May 18, 2017.  On May 1, 2019, the Arizona Supreme Court upheld the grant of penalty phase relief and remanded for merits consideration of the guilt and aggravation phase claims.  On March 4, 2020, the state trial court denied relief on the guilt and aggravation phase relief claims.  On February 2, 2021, The Arizona Supreme Court upheld the denial of relief on the guilt and aggravation phase claims.

6.   Other than the appeals and petitions listed above, Mr. Martinez has not filed any other application for relief in any state or federal court.

7.   Mr. Martinez is being held in custody in violation of his federal constitutional rights.  Because he has no training in the law and no counsel to represent him, and due to the imminent date of execution, he is unable to raise all of his federal constitutional claims in this petition.  Some of the grounds for relief which have been considered by the Arizona courts and which are therefore available to him and known to him are set forth below.

# PCR ISSUES

## I
### RICHARD PARRISH'S TRACK RECORD IN THIS CASE AND IN OTHER CASES BELIES ANY PRESUMPTION OF EFFECTIVENESS

History is important.  Blatant patterns are important.  We cannot ignore history and we cannot take history out of a case and pretend that we do not know.  In *Flowers v. Mississippi*, 139 S. Ct. 2228 (2019), for instance, the same state prosecutor struck 41 of 42 African-American prospective jurors in six consecutive trials of the same defendant.  The Supreme Court described the "relevant history of the State's preemptory strikes in past cases" as part of the "important evidentiary and procedural issues."

> Most importantly for present purposes, after Batson, the trial judge may still <u>consider historical evidence</u> of the State's discriminatory peremptory strikes from past trials in the jurisdiction, just as *Swain* had allowed.
>
> …
>
> <u>The numbers speak loudly.</u>  …  Not only did the State's use of peremptory strikes in Flowers' first four trials reveal <u>a blatant pattern</u> of striking black prospective jurors, the Mississippi courts themselves concluded on two separate occasions that the State violated Batson.
>
> …
>
> <u>The State's actions in the first four trials necessarily inform our assessment of the State's intent going into Flowers' sixth trial. We cannot ignore that history. We cannot take that history out of the case.</u>

*Flowers v. Mississippi*, 139 S. Ct. 2228, 2245-46 (2019).

The State saddled Mr. Martinez with trial counsel who was well-known for his ineffective representation of his clients and then took maximum advantage of it.  Pima County Jail visitation logs reveal that, in the 2-½ years before trial in this case, trial

4

counsel Richard Parrish met with Mr. Martinez for a total of 1:08.  On November 8, 2005, in the middle of trial in this case, Mr. Parrish was completely surprised to learn that F(5) pecuniary gain was one of the aggravators.  (RT November 8, 2005, pp.88, 150-151.)  Mr. Parrish actively dodged service of process and refused, by written letter, to appear at a hearing on the Rule 24 motion for a new trial as a witness for his own client, resulting in the trial court's observation that Mr. Parrish "is a little different."  (RT March 12, 2007, p.3-4.)  Unaware of the charges, unfamiliar with the evidence, unacquainted with his client, unconversant in death penalty litigation and overall uninterested in Mr. Martinez or his case, Mr. Parrish failed to provide any kind of representation at every stage of the process, to nobody's surprise.

In the case of *State v. Eva Mayfield*, CR-20021963,  Mr. Parrish was held in contempt when he showed up for a first-degree murder trial unaware of the charges against his client.  In the former death penalty case of *State v. Soto-Fong*, CR-39599, Mr. Parrish never met with his client, only ever corresponded with him once, and neglected to file a petition for review or to even notify Mr. Soto-Fong that his PCR had been denied.  On October 20-21, 2011, witnessed by FPD-CHU attorney Jennifer Garcia, PCPD attorney David Euchner, Mr. Parrish falsified his Capital Direct Appeal and PCR/Habeas Training cosponsored by the MCPD and the FPD-CHU, in order to qualify for the Arizona Supreme Court's list of counsel in capital PCR cases.  That matter was referred to the State Bar as part of the investigation in State Bar No. 12-1420 after the investigation began in the Hargrave matter.

In the death penalty case of *State v. Hargrave*, CR-2002009759, Mr. Parrish filed a Rule 32 PCR that was so badly deficient that the trial court struck the petition and referred Mr. Parrish to the State Bar.  While the State Bar investigation was pending in Hargrave, Mr. Parrish was ordered to show cause in the case of *State v. Robert Moody* as to why he should not be held in contempt for billing over $77,000.00 as PCR counsel in the Moody case despite never even having received the transcripts (120 volumes) from appellate counsel in the Moody case.  His explanation that he had read the transcripts online on the court's AGAVE database was quickly rebutted by the fact that AGAVE does not contain transcripts.  His subsequent claim that he had read the hard copies in the clerk's office was rebutted by the clerk's office itself, which stated that transcripts are stored offsite and require a written request, and that their records would have shown if Parrish had ever requested them.

## II
## PREJUDICE

Even with trial counsel's failure to prosecute a provocation defense, with trial counsel's failure to defend blatant prosecutorial misrepresentation of well-known facts and with trial counsel's failure to even know what the aggravating factors were going into the aggravation phase, the sentencing in this case was close, with the jury even sending out a note at one point indicating that it was hung.  (ROA 341.)  But trial counsel went to trial with no plan as to how to defend the felony-murder and premeditated-murder charges, was blindside surprised by the prosecutors "Cisco's BBQ" mischaracterization

6

and failed to rebut a pecuniary gain aggravator with easily available evidence that the

victim had drugged and raped codefendant Summey-Montano's eleven-year-old cousin.

### III
### TRIAL COUNSEL'S NEARLY COMPLETE FAILURE TO MEET WITH MR. MARTINEZ FOR 2 1⁄2 YEARS PRIOR TO TRIAL

Pima County Jail visitation logs reveal that, in the 2 ½ years, Mr. Parrish met with

Mr. Martinez for a total of only 1:08.

| DATE | TIME OF VISIT | LENGTH OF VISIT |
|---|---|---|
| 6/16/03 | 11:33-11:50 | 0:17 |
| 6/23/03 | 10:46-10:50 | 0:04 |
| 8/5/03 | Unknown-8:59 | |
| 8/11/03 | 8:42-8:43 | 0:01 |
| 10/1/03 | 8:37-8:45 | 0:08 |
| 2/23/04 | 8:55-9:00 | 0:05 |
| 7/1/04 | 8:28-8:41 | 0:13 |
| 12/28/04 | 8:25-8:30 | 0:05 |
| 7/6/05 | 7:55-8:05 | 0:10 |
| 7/15/05 | 8:33-8:38 | 0:05 |
| 9/13/05 | Unknown-8:50 | |
| TOTAL TIME SPENT WITH CLIENT IN 2 ½ YEARS | | 1:08 |

In the three-and-a-half months before the November 1, 2005, trial, during the trial,

after the trial and while the sentencing on the non-capital charges was pending, Mr.

Parrish visited Mr. Martinez not at all.  Second chair counsel visited Mr. Martinez one additional time, on March 22, 2005, for an additional fourteen minutes.

## IV
## TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE USE OF A PRE-1978 FELONY-MURDER INSTRUCTION

The Arizona Supreme Court determined the pre-1978 felony-murder instruction to be error.  *State v. Martinez*, 218 Ariz. 421, 428 (2008).  It was harmless on direct appeal only because there was also a premeditated murder conviction and Mr. Martinez could not challenge the IAC underlying his premeditated-murder conviction on direct appeal.  Now, however, with the felony-murder basis for the first-degree murder conviction flawed, the first-degree murder conviction is based solely on the (ineffective) premeditated-murder basis.        Also, a 30-year obsolete felony-murder instruction is yet one more colossal error by trial counsel.

## V
## TRIAL COUNSEL WAS INEFFECTIVE IN OVERLOOKING AN OBVIOUS ADEQUATE PROVOCATION DEFENSE TO PREMEDITATED-MURDER

Despite an obvious adequate provocation defense on nearly every page in the disclosure, trial counsel sat through the guilt phase of this trial with no idea as to how he might defend against a first-degree murder conviction.  The victim drugged and raped codefendant Summey-Montano's eleven-year-old cousin at the party at which he was killed.  That was highly provocative contributory conduct.

8

# VI
## TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO INSTRUCTIONS THAT A HUNG JURY IN THE AGGRAVATION PHASE WOULD RESULT IN A LIFE SENTENCE

The statute is very clear:

> "At the aggravation phase, if the trier of fact is a jury, the jury is unable to reach a verdict on any of the alleged aggravating circumstances and the jury has not found at least one of the alleged aggravating circumstances has been proven, the court shall dismiss the jury <u>and shall impanel a new jury</u>." [Emphasis added.]

A.R.S. § 13-703.01(J).  Somehow trial counsel let the trial court repeatedly misstate a

hung jury into an automatic life sentence:

> "If you deliberate with your fellow jurors and you cannot unanimously decide, beyond a reasonable doubt, that there is an aggravating factor, then the trial is over and, again, I go ahead and sentence Mr. Martinez, because you have already convicted him of first degree murder.  <u>But the death penalty is not on the table any more</u>."  [Emphasis added.]

(RT November 2, 2005, pp.51-52.)

> "If you do not unanimously find the State has proved at least one aggravating circumstance, your jury service will end, <u>and the court will sentence the defendant either to natural life imprisonment without the possibility of parole or life imprisonment without the possibility of parole until at least 25 years have been served</u>."  [Emphasis added.]

(RT November 10, 2005, p.23.)

> "If you do not unanimously find the State has proved at least one aggravating circumstance, your jury service will end, <u>and the court will sentence the defendant either to natural life imprisonment without the possibility of parole or life imprisonment without the possibility of parole until at least 25 years have been served</u>."  [Emphasis added.]

(ROA 347, p.3.)

## VII
### TRIAL COUNSEL WAS UNAWARE THAT F(6) IS A MULTI-PRONGED DISJUNCTIVE AGGRAVATOR

While the aggravation phase instructions were being settled, trial counsel exhibited his complete lack of familiarity with the F(6) disjunctive aggravator and its multiple prongs – cruelty and heinousness/depravity.  Anyone with a passing familiarity with the F(6) aggravator would realize that it is phrased and interpreted in the disjunctive and that a finding on any of the multiple prongs, the "*Gretzler* factors," is sufficient to prove the F(6) aggravator.  *State v. Gretzler*, 135 Ariz. 42, 51 (1983).

## VIII
### TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO REALIZE THAT ONE OF THE AGGRAVATORS WAS F(5) PECUNIARY GAIN AND IN FAILING TO USE WHAT COULD HAVE BEEN OVERWHELMING EVIDENCE OF A CHILD MOLESTATION MOTIVE TO REBUT THE F(5) PECUNIARY GAIN AGGRAVATOR

After all the evidence was in, while the jury was deliberating the guilt phase and jury instructions were being settled for the aggravation phase, counsel for Mr. Martinez realized that F(5) pecuniary gain was one of two aggravators that the state already proved and intended to argue:

> MR. PARRISH: You know, let me point out that you, in this instruction on the alleged aggravating factors, did what I thought was going on here, that the aggravating factor was especially heinous, cruel or depraved.  Where was I when the other aggravating factor of pecuniary gain –

THE COURT:  The pecuniary gain I missed.  Actually when I was – this afternoon my colleague and I were talking and he noticed that it was alleged, the pecuniary gain was alleged, and you had.  It's just that we never really talked about that.  Since we – I mean even – I don't remember ever talking about it, but that doesn't mean it wasn't allege, it was.

MR. PARRISH:  I thought it was removed.

MS. GODOY:  No, not at all.  During the voir dire phase you asked – I think there was some individual voir dire and you asked what our aggravating factors were, and I think one of us said – started to say especially cruel, heinous and depraved, and we didn't get a chance to say the second one.  I think you picked up on that and started to question the juror about that.  I think it might have been Mr. Guillen, maybe.

(RT 11/8/05 pp.150-151.)  Earlier that same day, the defense was confused as to the relevance of victim's roommate's testimony about items stolen from her apartment:

MR. PARRISH:  May we approach for a moment, Your Honor?

THE COURT:  Sure.

(At the bench, on the record.)

MR. PARRISH:  I confess that I am perplexed, if there is no robbery allegation and there is no pecuniary gain allegation, I don't know what the relevancy is.

THE COURT:  It corroborates what Lopez – what Lopez said, they went to the house, they came back with items and so forth.

MS. GODOY:  There is a pecuniary gain aggravating circumstance.

THE COURT:  Yeah, I just noticed that at lunch time that they did allege that.   We'll talk about that, but they mentioned it as well.

MR. PARRISH:  I thought you said there wasn't a pecuniary gain.

11

1       MS. GODOY:  No, we did.

2  (RT 11/8/05 p.88.)

3       After that, all of the evidence was in.  The State presented no evidence in the

4  aggravation phase, relying instead on the evidence offered in the guilt phase.  If the

5  defense had realized that pecuniary gain was emerging as a motive for the killing and

6  would serve as an aggravator to justify a death sentence, it could have worked to establish

7  the victim's contributory conduct in molesting Summey-Montano's eleven-year-old

8  cousin, rather than robbery, as the true motive for the killing.  Unaware that the State was

9  proving an aggravator, defense counsel ignored the real motive for this murder and let the

10  State prove a pecuniary gain motive unhindered.  Instead, during the entire aggravation

11  phase – openings, evidence and closings – defense counsel made no mention of the

12  victim's contributory conduct in having molested Summey-Montano's cousin.  Counsel's

13  lack of awareness of the F(5) pecuniary gain aggravator is well below prevailing

14  professional norms.

15
16                                        **IX**
                    **THE PROSECUTOR'S MISLEADING**
17        **MISCHARACTERIZATION OF MR. MARTINEZ'S INITIAL**
                **EXPLANATION FOR HIS PRESENCE IN THE**
18           **NEIGHBORHOOD AS COMING FROM "CISCO'S BBQ"**

19       All of the disclosure, every single police report, all of the interviews and all of the

20  free-talks were perfectly clear that Mr. Martinez said that he was returning from "Cisco's

21  house," and they all clarified to the State that there was no "sick joke" and that the group

really did have a friend in the neighborhood named "Cisco" whose house they said they were coming from as an explanation for why they were in the neighborhood.  No one but the prosecutor ever said that they were "coming from Cisco's BBQ."  The prosecutor's argument was pure fabrication and not one page of one report or one witness statement would support it.

Through trial counsel's inattention and ineffectiveness, the State's guilt phase opening statement, after describing black smoke "pouring" into the sky, the fire "ravaging" the victim's body, burning it "beyond recognition," blatantly misquoted Mr. Martinez as saying, "You know what he tells them?  I am coming from a BBQ."  (RT November 3, 2005, p.80.)  Very predictably, and with no push back from the defense, the State's aggravation phase closing argument even more blatantly misquoted Mr. Martinez as concocting "a sickening, sickening excuse to offer up to the police officers – we were at Cisco's barbecue."  (RT November 10, 2005, p.28.)

The sick joke was entirely the State's.  The prosecutor's misconduct went entirely unchecked by Mr. Martinez's failed defense counsel.  Had anyone else been representing Mr. Martinez, the State never would have tried such an outrageous overreach contrary to every single report, every single interview and every single free-talk.

13

1

2

3

4

## X
## TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PRESENT, OR TO EVEN ALLOW, EVIDENCE THAT A NECKLACE IDENTIFIED AS BELONGING TO THE VICTIM WAS ACTUALLY MR. MARTINEZ'S LONG BEFORE THE DATE OF THE OFFENSE

5

6

7

8

9

10

11

The F(5) pecuniary gain aggravator would have been limited to $2.00, a used printer and a bottle of Alizé – laughably insufficient to motivate a murder, especially where the expressed motivation by everybody involved was that the victim had drugged and raped codefendant Summey-Montano's eleven-year-old cousin at the party.  But trial counsel was paying no attention whatsoever to Mr. Martinez or to his case and allowed the case detective to lie, testifying that the victim's roommate had claimed Mr. Martinez's necklace as her own.

12

13

14

15

16

17

18

19

20

Mr. Martinez was sitting at the defense table with pictures that were taken of himself wearing the necklace long before the date of the murder.  Mr. Martinez's family recognized the necklace as his long before the date of the murder.  But trial counsel would not pay any attention to Mr. Martinez.  Robbery was not on the booking sheet or on the indictment.  Nor was robbery used as a predicate felony for the felony-murder charge.  This was never a robber case and incidental robbery has never been sufficient to support a F(5) pecuniary gain aggravator in Arizona.  *State v. Rose*, 231 Ariz. 500, 516 (2013).  At this point the State is trying to execute Mr. Martinez for stealing a necklace that the State knows already belonged to Mr. Martinez.

21

## XI
## TRIAL COUNSEL WAS INEFFECTIVE IN DODGING A DEFENSE SUBPOENA TO THE HEARING ON THE RULE 24 MOTION FOR NEW TRIAL

Mr. Parrish erased all doubt about whether he ever cared about Mr. Martinez or about Mr. Martinez's case when he sent the court and all parties a letter refusing to appear at a Rule 24 motion for a new trial and announcing that he was dodging a subpoena (already properly served) for the proceeding. The bizarre letter reflects a complete disregard for his client, for the courts, for his professional obligations and for his ethical duties. It is a shameless affirmation that Richard Parrish never did care about Mr. Martinez or about Mr. Martinez's case.

## XII
## THE STATE COURT REFUSES CUMULATIVE ERROR REVIEW OF IAC CLAIMS

Cumulative error review for IAC claims is well-established. *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000); *Kyles v. Whitley*, 514 U.S. 419, 436 (1995); *Pizzuto v. Arave*, 385 F.3d 1247 (9th Cir. 2004) ("individual deficiencies in representation which may not by themselves meet the Strickland standard may, when considered cumulatively, constitute sufficient prejudice to justify issuing the writ"). For reasons known only to the State, the State convinced the state court to flatly announce that it would not consider the errors cumulatively. The result is that Arizona will execute a person even if the collective errors of trial counsel have undermined the court's confidence in the outcome of the trial – executions without confidence.

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

**XIII**
**THE STATE COURT APPLIED A SERIES OF WRONG IAC**
**STANDARDS**

The standard for determining IAC claims is simple.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  It is less than a preponderance standard. *Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").

At p.2 of its March 3, 2020, ruling, the trial court exchanges the *Strickland* standard for "demonstrable reality and not merely a matter of speculation," as if we could peer into an alternate reality where these deficiencies did not occur and actually observe the outcome – an impossible standard.  At pp.2-3 the trial court begins dismissing claims of prejudice as "Martinez can only speculate that the outcome would have been different" and "prejudice for Rule 32 relief is too speculative for this Court."  At p.3 the trial court shifts to a preponderance standard (also too high), stating "this Court does not believe that the jury would likely have come to a different result."  By p.5, the trial court has raised the standard it is applying all the way back up to "would have resulted in a different outcome" – akin to a reasonable doubt, or at  least a clear and convincing standard.

The correct standard is a simple loss of confidence in this trial.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  The escalating standards of "would likely," "would have" and "demonstrable reality" were all rejected within *Strickland* itself.

# DIRECT APPEAL ISSUES - PROSECUTORIAL MISCONDUCT

## XIV
### THE STATE MISQUOTED AND MISREPRESENTED MR. MARTINEZ'S STATED ALIBI AT THE TIME OF HIS ARREST INTO A SICK JOKE THAT THEY WERE LEAVING "CISCO'S BBQ"

It was not only trial counsel's fault for standing mute while the State misquoted and misrepresented Mr. Martinez's stated alibi at the time of his arrest ("Mr. Martinez said that they were going to a friend's house for a barbecue and the friend was not home, so they left") into a sick joke that they were leaving "Cisco's BBQ," it was also the State's fault for its own misconduct in misstating what it knew to be its own fabrication into a heinousness aggravator.  That heinous misstatement is both a prosecutorial misconduct claim and an ineffectiveness claim.  Just because defense counsel checked out before the trial ever started does not mean that the State can or should misrepresent facts that it knows to be untrue.

**XV**
**THE STATE, DESPITE HAVING BEEN TOLD BY ITS OWN**
**WITNESS IN A PRETRIAL FREETALK THAT MR.**
**MARTINEZ'S MISSED FIRST SHOT WAS NOT**
**INTENTIONAL, ARGUED THAT MR. MARTINEZ**
**INTENTIONALLY MISSED THE VICTIM WITH HIS FIRST**
**SHOT IN ORDER TO INFLICT ADDITIONAL EMOTIONAL**
**DISTRESS**

The State knew from its own witness that Mr. Martinez did not miss the victim

intentionally in order to inflict additional emotional distress.

> Q      'Kay.  Did it look like that was an intentional, could you tell whether
> or not CODY missed him on p…uh, intentionally or if he was…
> A      No.
>
> Q      …trying…
> A      He…
>
> Q      ...to scare him or…
> A      … was trying to shoot him.
>
> Q      Trying to shoot him?  How far was CODY from, uh, from the victim
> when he shot?
> A      Two feet.

(Free Talk of Michael Lopez conducted July 11, 2003.)  But the State happily overlooked

its own witness's free talk and argued that the missed shot was intentional and was

additional evidence of cruelty.

> "In an act that can only be described as debased, perverse, shockingly evil,
> what does this man do?  What does he do?  He intentionally fires that gun
> and misses.  He misses, folks.  One of the very last things Francisco Aguilar
> hears is him chuckling; is him chuckling.  And saying, 'Oops.  Missed.'
> Missed.

"The evidence, folks, that this was a murder that was especially cruel, is overwhelming.  The cruelty of this murder permeates every aspect of this case.  It defines this case."

(RT November 10, 2005, p.37.)  The state's misconduct in again arguing facts it knew to be untrue again denied Mr. Martinez due process.  Effective counsel would have been prepared to rebut this misstatement as well.

## XVI
**THE STATE, KNOWING THAT BOTH MR. MARTINEZ AND MR. SUMMEY- MONTANO HAD TOLD WITNESSES, WHILE THE VICTIM WAS STILL ALIVE, THAT HE WAS BEING KILLED BECAUSE HE HAD MOLESTED MR. SUMMEY-MONTANO'S ELEVEN-YEAR-OLD COUSIN, ARGUED THAT THE ALLEGED MOLESTATION WAS A RECENT FABRICATION RELAYED BY MR. MARTINEZ TO DR. PERRIN**

The State, knowing that both Mr. Martinez and Mr. Summey-Montano had told witnesses Fernando Bedoy, Paul Kelso, and Michael Lopez, while the victim was still alive, that the victim was being killed because he had molested Mr. Summey-Montano's eleven-year-old cousin, not only presented the case as a murder intended solely to cover up a robbery, but also argued that the molestation was a recent fabrication relayed by Mr. Martinez to Dr. Perrin.  (RT November 17, 2005, 52-53.)

Teresa Godoy was present when Fernando Bedoy told the State at a free talk that Cody told him at the AM/PM that they were doing it because the victim had molested a cousin of Mr. Summey-Montano.  (Free Talk of Fernando Bedoy conducted June 20, 2003.)  Co-prosecutor Kellie Johnson was there when  Bedoy said the same thing at a

19

defense interview.  (Defense Interview of Fernando Bedoy conducted January 20, 2005.)
Teresa Godoy and Kellie Johnson were both there when Bedoy said the same thing again
in response to the Court's question at the aggravation/mitigation hearing for Mr.
Summey-Montano.  (RT January 31, 2005, Testimony of Fernando Bedoy at Aggravation/
Mitigation Hearing of Johnathan Summey-Montano, pp.124-125.)  The State knew that
Paul Kelso had said in his statement that Mr. Summey-Montano had told him the same
thing.  (Interview of Paul Kelso conducted June 23, 2003.)     The State knew that Mr.
Martinez's and Mr. Summey-Montano's stated motive, even while the victim was still
alive, was to avenge the child rape of Mr. Summey-Montano's 11-year-old cousin.  To
say that this is a 6-week-old fabrication or that it does not match the evidence,
particularly the evidence of Fernando Bedoy, is flatly untrue.  And, not only is the
allegation of recent fabrication unfounded, it is also a comment on Mr. Martinez's right to
remain silent.  Even if it were true, the prosecutor would have been commenting on the
fact that Mr. Martinez had not told them of his motive for killing the victim sooner.

# DIRECT APPEAL ISSUES  - GUILT PHASE

## XVII
### INSUFFICIENCY OF EVIDENCE TO SUPPORT FELONY MURDER CONVICTION WHERE THE MURDER DID NOT FURTHER THE KIDNAPPING

The victim was kidnapped in order to be killed; not the other way around.  He was
not killed in order to be kidnapped.  The kidnapping furthered the murder.  But the killing

1   (or the "actions" that resulted in his death.) did not further the kidnapping.  It ended the

2   kidnapping.

3        A.R.S. § 13-1105(A)(2) requires that the death be caused, not only in the course of

4   the underlying offense, but also in furtherance of the underlying offense.  A death is

5   deemed to be "in furtherance of" an underlying felony if it results from an action taken to

6   facilitate the accomplishment of the underlying felony.  *State v. Arias*, 131 Ariz. 441, 443

7   (1982).  The victim's death in this case did not result from an action which furthered the

8   felony.  The felony, kidnapping, was perpetrated to further the killing.  See, *Ario v.*

9   *Superior Court*, 124 Cal. App. 3d 285 (1981) (special circumstance of kidnapping not

10  proven as the murders did not occur "while engaged in kidnapping" where the

11  kidnapping was part of an expressed plan to drive the victims to the execution site to

12  murder them).  Mr. Martinez's conviction of felony murder, in the absence of evidence to

13  support the "in furtherance of" element, violates the due process clause.

14

15  **XVIII**
    **PRE-1978 FELONY-MURDER INSTRUCTION**

16       The Arizona Supreme Court determined the pre-1978 felony-murder instruction in

17  this case to be error.  *State v. Martinez*, 218 Ariz. 421, 428 (2008).  It bears repeating,

18  however, because the State repeatedly tries to rely on the (erroneous) felony-murder

19  conviction in an attempt to render the (ineffective) premeditated-murder conviction

20  harmless.  It does not, however, work that way.  The State needs at least one unflawed

21  basis for its first-degree murder conviction.

21

The trial court's guilt phase jury instructions included the flawed pre-1978 instruction that:

> "With respect to the felony murder rule, insofar as it provides the basis for a charge of first degree murder, it is the law that <u>there is no requirement that the killing occur while committing or engaged in the felony</u>, or that the killing be a part of the felony. The homicide need not have been committed to perpetrate the felony. <u>It is enough if the felony and the killing were part of the same series of events</u>."

(RT November 9, 2005, p.25.)  That instruction is contrary to A.R.S. § 13-1105(A)(2), effective on October 1, 1978, which specifically requires the state to prove both that the death was "in the course of" the underlying felony, and also that it was "in furtherance of" that felony.

| | | |
|---|---|---|
| "no requirement that the killing occur while committing or engaged in the felony" | ⟨≠⟩ | in the course of the offense |
| "It is enough if the felony and the killing were part of the same series of events" | ⟨≠⟩ | in furtherance of the offense |

Under Arizona case law, a death is deemed to be "in furtherance of" an underlying felony only if it results from an action taken to facilitate the accomplishment of the felony.  *State v. Arias*, 131 Ariz. 441, 443 (1982) ("appellant admitted that he and Corrales bound and gagged Mrs. McDiarmid in order to finish ransacking her house for valuables. Appellant's actions, which resulted in the death of Mrs. McDiarmid, were

clearly 'in furtherance of' the burglary and kidnapping."); *State v. Hallman*, 137 Ariz. 31 (1983) ("the jurors could have concluded that defendant decided to rape Meyers, that he knew he would be in serious trouble with Geyer if he did this, so he killed Geyer and then tried to rape Meyers").

## XIX
### THE TRIAL COURT'S REFUSAL TO ORDER SENTENCED CODEFENDANT SUMMEY-MONTANO TO TESTIFY REGARDING THE VICTIM'S MOLESTATION OF MR. SUMMEY- MONTANO'S 11-YEAR-OLD COUSIN

On November 3, 2005, counsel for Mr. Martinez filed a motion to compel the testimony of codefendant Summey-Montano.  (CR 298.)  That motion was denied in court on November 3, 2005, Day 3 of Trial, and again on November 9, 2005, Day 6 of Trial.  (CR 306, 323; RT November 3, 2005, pp.3-9; RT November 8, 2005, pp.8, 137-140, 154; RT November 9, 2005, pp.11-17.)  The jury was instructed not to speculate upon or even consider Mr. Summey-Montano's absence from court.  (CR 344.)  Mr. Summey-Montano was, however, the one codefendant with a complete understanding of the victim's contributory conduct that led to his own death.  It was Mr. Summey-Montano's 11-year old cousin that the victim drugged and raped.  It was Mr. Summey-Montano that suggested the attack, that produced the shotgun, that taped the victim up, that stole his jewelry and that directed the others to the apartment at which the victim was staying.  (RT 1/31/05 pp.32, 38, 40, 42-44, 46, 49.)  When the car they were using broke down, it was Mr. Summey-Montano that called for a ride using the victim's cell phone.

1   (RT 1/31/05 p.56.)  If anyone knew why the victim was killed, it was Mr. Summey-

2   Montano.

3       The State was not only able to call codefendants Michael Lopez and Fernando

4   Bedoy as witnesses, it was able to reward their testimony with plea bargains to twelve

5   year caps.  (CR 98, 104; RT November 3, 2005, pp.131-200; RT November 4, 2005,

6   pp.7-47; November 8, 2005, pp.14-60.)  Lopez and Bedoy knew what they observed, but

7   they did not know what was motivating Mr. Summey-Montano and Mr. Martinez.  The

8   State cast the killing as a robbery.  And by calling eyewitnesses for the State with no real

9   knowledge of what was motivating Mr. Summey-Montano and Mr. Martinez while at the

10  same time failing to grant Mr. Summey-Montano use immunity so he could testify for the

11  defense, the State was able to twist the fact-finding, hiding the victim's contributory

12  conduct and presenting, instead, an inaccurate pecuniary gain aggravator.

13      The prosecution's failure to grant use immunity to a defense witness denies the

14  defendant a fair trial, when the witness' testimony would have been relevant and "the

15  prosecution granted immunity to a government witness in order to obtain that witness'

16  testimony, but denied immunity to a defense witness whose testimony would have

17  directly contradicted that of the government witness".  *Williams v. Woodford*, 306 F.3d

18  665 (9th Cir. 2001)  The fact-finding process is intentionally distorted where the

19  prosecutor . . . grants immunity to a witness in order to obtain his testimony, while

20  denying immunity to a defense witness whose testimony would directly contradict that of

21  the government witness.  *United States v. Duran*, 189 F.3d 1071, 1087 (9th Cir. 1999).

24

**XX**

**THE TRIAL COURT INSTRUCTED THE JURY THAT MR. MARTINEZ WOULD HAVE A CHANCE TO APPEAL ANY CONVICTION TO THE APPELLATE COURTS**

THE COURT:  Does anybody want any further explanation about a person's rights?

Yes. Mr. Boyle

PROSPECTIVE JUROR:  Yes.  The Court, when they prosecute him, after, can he still come back and present – I mean, if the Court finds him guilty, is there anyway that he can still –

THE COURT:  Well, let me give you a little general education.

In this case, the Court is not going to make any decision about guilt or innocence.  The jury is going to do that.  Assume, hypothetically, that Mr. Martinez is acquitted.  Then he is done.  It is all over.

If he is convicted of any offense, then there will be a sentencing.  If that happens, anybody who is convicted of a crime has various Post-Conviction Relief rights.  In other words, they can appeal the conviction.  A higher court can review it and see if I did anything wrong, or if I made any improper rulings, if Mr. Martinez's constitutional rights were violated, that kind of thing.

So, there is an appellate process, if that answers your question.

PROSPECTIVE JUROR:  Okay.  All right.

(RT November 1, 2005, p.31.)  In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the

United States Supreme Court overturned a capital sentence as inadequately reliable

because of a statement made by the prosecutor, in closing argument at the penalty phase

1  of the trial that, "Your decision is not the final decision"; "the decision you render is

2  automatically reviewable by the [State] Supreme Court."

3

4
### XXI
### DENIAL OF MOTIONS TO STRIKE JURORS FOR CAUSE

5          Although Mr. Aguilar's body was burned, at Mr. Summey-Montano's suggestion,

6  to destroy fingerprint evidence, Prospective Juror Guillen got hung up on his idea that

7  burning a body was evidence of a hate crime, bringing his own private non-statutory

8  aggravator to the panel.  (RT November 2, 2005, pp.78-100; RT November 3, 2005,

9  pp.22-36.)  Trial counsel's motion to strike was twice denied, and the defense ultimately

10  had to use one of its peremptory strikes to remove Mr. Guillen from the panel.  (ROA

11  350.)  Trial counsel used all 10 peremptory strikes in jury selection.  (ROA 350.)

12

13
### DIRECT APPEAL ISSUES - AGGRAVATION PHASE

14

15
### XXII
### THE DEFENSE WAS SURPRISED TO LEARN, AT THE END OF THE GUILT PHASE, THAT F(5) PECUNIARY GAIN WAS ONE OF THE AGGRAVATORS THAT THE STATE HAD JUST PROVED

16

17          On July 28, 2003, the State filed its death notice in this case alleging both F(5) and

18  F(6) as aggravators.  (ROA 65.)  On August 28, 2003, it disclosed its list of witnesses and

19  exhibits it intended to use to prove both F(5) and F(6).  (ROA 74.)  On September 16,

20  2003, counsel for codefendant Summey-Montano filed a motion to strike the death

21

26

1   notice, attacking the applicability of both F(5) and F(6).  (ROA 84.)  Over two years later,

2   after all the evidence was in, while the jury was deliberating the guilt phase and jury

3   instructions were being settled for the aggravation phase, counsel for Mr. Martinez

4   realized that F(5) pecuniary gain was one of two aggravators that the state already proved

5   and intended to argue.  (RT November 8, 2005, pp.150-151.)  In fact, earlier that same

6   day, the defense was confused as to the relevance of Fritzie Gonzalez's testimony about

7   items stolen from her apartment.  (RT November 8, 2005, p.88.)

8        Mr. Martinez was entitled to a trial in which his counsel knew the charges against

9   him.  *In re Oliver*, 333 U.S. 257, 273 (1948) ("A person's right to reasonable notice of a

10  charge against him, and an opportunity to be heard in his defense –  a right to his day in

11  court –  are basic in our system of jurisprudence"); *Smith v. O'Grady*, 312 U.S. 329, 334

12  (1941) ("real notice of the true nature of the charge against him, the first and most

13  universally recognized requirement of due process").  The trial court's error in proceeding

14  with a capital trial when defense counsel expressed surprise upon learning the

15  aggravators denied Mr. Martinez his right to be informed of the charges and due process

16  of law.

17

18                          **XXIII**
     **OFF THE RECORD ANSWERS TO JURY QUESTIONS**

19       The record on appeal contains several jury questions and the respective answers

20  from the trial court which are not reflected in the court reporter's transcript.

21

"Is murder as an attempt to cover up a robbery considered a murder for pecuniary gain?"
-Juror Foreperson

"You must rely on the Court's instructions and make your determination. No further explanation is appropriate at this time."
-Judge Fell

(ROA 338, dated November 10, 2005, 2:20 p.m., filed November 18, 2005.)
"B.  If some jurors agree that there are mitigating circumstances must all jurors be in agreement that a mitigating circumstance exists.  A.  Must we be unamous (sic) to find for life."
-Juror Foreperson

"A. See #1 re:unanimous
"B. You must rely on the instructions given.  No further instructions will be provided."
-Judge Fell

(ROA 339, undated, filed November 18, 2005.)
"The instructions have confused some.  Does the verdict have to be unanimous for death or life?  Some think only death sentence has to be unamous (sic)."
-Juror Foreperson

"Your verdict must be unanimous no matter what your decision is."
-Judge Fell

(ROA 340, dated November 17, 2005 2:40 p.m., filed November 18, 2005.)

The reporter's transcript for the end of each phase of the trial contains no mention of any of these questions or their proposed answers before they were answered.  (RT November 9, 2005, pp.66-68, Day 6 Guilt Phase, jury excused to deliberate then returns verdicts; RT November 10, 2005, pp.68-69, Day 7 Aggravation Phase, jury excused to deliberate then returns verdicts; RT November 17, 2005, pp.75, Day 10 Penalty Phase,

28

jury excused to deliberate; RT November 18, 2005, pp.2-8, Day 11 Penalty Phase, jury

returns verdict.)  Although the bailiff believes she called somebody, lead counsel was at

the hospital with his mother.  (Supplemental ROA 22; RT March 12, 2007, pp.4, 6-7.)

Second chair has no recollection of any call.  (RT March 12, 2007, pp.4-8.)  Mr. Martinez

was never contacted in his holding cell in the courthouse and had no opportunity to be

present.  (RT March 12, 2007, pp.21-26.)  The mitigation specialist, in the hallway with

the defendant's family, was not informed of any discussions regarding any call or

questions.  (RT March 12, 2007, pp.26-28.)

The United States Supreme Court has observed that an ex parte meeting between a

trial judge and a juror creates a situation "pregnant with possibilities for error." *United*

*States Gypsum Co*., 438 U.S. 422, 460 (1978).  In a federal prosecution of a criminal

defendant, "any private communication, contact, or tampering directly or indirectly, with

a juror during a trial about the matter pending before the jury is . . . deemed

presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954).


## XXIV
### THE TRIAL COURT INSTRUCTED THE JURY THAT A HUNG JURY WOULD BE EQUIVALENT TO AN ACQUITTAL ON THE AGGRAVATORS, THEREBY COERCING THE VERDICT

A.R.S. § 13-703.01 requires a retrial if the jury hangs on the aggravators.  The trial

court, however, repeatedly instructed the jury that, if it hung on the aggravators, that

would operate as an acquittal, taking death off the table and resulting in a life sentence.

(RT November 2, 2005, p.52; RT November 10, 2005, p.23; ROA 347.)  Such an instruction that a holdout juror would effectively veto the will of the rest of the jurors for all time could only pressure such a holdout juror to agree with the other jurors lest he unfairly single-handedly thwart their judgment, depriving Mr. Martinez of his due process right to an uncoerced jury verdict

## XXV
## F(5) PECUNIARY GAIN AGGRAVATOR

Of the boys partying at Josh Carpena's mom's house that morning, Mr. Aguilar had the least to steal.  He had no car.  He was staying at a friend's apartment.  He had no job.  He had $2.00 (no money).  Mr. Martinez had to give him money to go to the store.  Mr. Aguilar's biggest liability was that he had molested Mr. Summey-Montano's eleven-year-old cousin.  Anything else was incidental and inadequate to support a finding of F(5) pecuniary gain.  *State v. Prince*, 160 Ariz. 268 (1989) (Elimination of a drug debt owed to the victim was a collateral benefit and not the motive for the killing.); *State v. Wallace*, 151 Ariz. 362 (1986) (The taking of property was incidental to the murders, which stemmed from relationship difficulties with one of the victims.); *State v. Gillies*, 135 Ariz. 500 (1983) (The purpose of the murder was to eliminate the witness to the victim's rape, the robbery was an afterthought.); *State v. Madsen*, 125 Ariz. 346 (1980) (Life insurance by itself is not enough to prove pecuniary gain – the defendant would have killed the victim even without the life insurance benefits.)

1    Mr. Aguilar would have been killed for molesting Mr. Summey-Montano's cousin

2    even without the $2.00 in his sock and the bottle of Alizé at his apartment.  To establish

3    the F(5) aggravator, the State must prove that the murder would not have occurred "but

4    for" the defendant's pecuniary motive.  *State v. Garza*, 207 Ariz. 56, 68 (June 29, 2007)

5    ("To establish the (F)(5) aggravator, the State must prove that the murder would not have

6    occurred but for the defendant's pecuniary motive.  *Ring*, 204 Ariz at 560 P75, 65 P.3d at

7    941.").  Mr. Martinez's conviction on this aggravator, in the absence of evidence

8    supporting it, violates due process.

9

10

11

**XXVI**
**INAPPLICABILITY OF F6 CRUELTY AGGRAVATOR – MR.**
**MARTINEZ IS NOT VICARIOUSLY LIABLE FOR MR.**
**SUMMEY-MONTANO'S CRUELTY**

12    Everything that was cruel was done by codefendant Summey-Montano.  Which is

13    understandable, since it was Mr. Summey-Montano's cousin that the victim drugged and

14    raped.  Despite having accounted for most of the aggravation, Mr. Summey-Montano got

15    the minimum sentence under his plea agreement – 25 to life – while Mr. Martinez got the

16    maximum sentence.  Michael Lopez testified that, while Mr. Martinez gave the victim

17    money to go to the store, it was Summey-Montano who suggested robbing the victim.

18    (RT November 3, 2005, pp. 138-39, 143-44.)   Summey-Montano was the one who got

19    Joshua's shotgun, asked for the tape, and loaded the victim into Joshua's car.  (RT

20    November 3, 2005, pp.152, 155, 157.)   Summey-Montano called Paul Kelso for a ride

21    when Joshua's car broke down.  (RT November 3, 2005, pp.170.)  It was Summey-

Montano who stabbed the victim in the hand while he was in the back of Fernando

Bedoy's Explorer.  (RT November 3, 2005, pp.180.)  It was Summey-Montano who was

tormenting the victim with his own CD, asking his favorite song and hitting him with the

case.  (RT November 3, 2005, pp.181.)  Summey-Montano was the one who suggested

taking Mr. Aguilar to the area of the desert known as "the shooting range.  (RT November

5, 2005, p.31.)  It was Summey-Montano who stabbed the victim in the stomach.  (RT

November 3, 2005, pp.187.)   Summey-Montano was the one whose worries about

fingerprints led to the burning of the victim's body.  (RT November 5, 2005, pp.49, 59.)

Summey-Montano's cruelty is not attributable to Mr. Martinez.  *State v. Carlson*,

202 Ariz. 570, 583 (2002) ("There is no vicarious liability for cruelty in capital cases

absent a plan intended or reasonably certain to cause suffering. The plan must be such

that suffering before death must be inherently and reasonably certain to occur, not just an

untoward event.").  Mr. Martinez's conviction on this aggravator, in the absence of

evidence supporting it, violates due process.

**XXVII**
**INAPPLICABILITY OF F6 HEINOUS AND DEPRAVED**
**AGGRAVATOR – THERE WAS NO EVIDENCE OF**
**RELISHING, GRATUITOUS VIOLENCE OR MUTILATION**

Nothing in the facts of this case suggests that Mr. Martinez relished the murder.

He was acting the clown at the Pima County Jail after his arrest, wondering if he would

be on the news.  (RT November 8, 2005, pp.72-81.)  But his interest in the news was well

short of the letter held insufficient to support a finding of relishing in *State v. Greene*, 192

Ariz. 431 (1998) ("Mother fuckin' snitch's rank right up there with child molesters &

homosexuals. And if you have seen the news lately then you probably got a pretty good

idea as to how I feel about faggots! Very sincerely yours, Beau Greene, convicted

murderer, death row alley.")

Nor is there any evidence of mutilation as a theory of heinousness and depravity as

the evidence was that the body was burned to eliminate fingerprints rather than for the

purpose of mutilation.  (RT November 10, 2005, p.63; RT November 5, 2005, pp.49, 59.)

State v. Medina, 193 Ariz. 504, 514 (1999) ("Mutilation requires some indication that the

defendant had a "separate purpose to mutilate the corpse.").

# DIRECT APPEAL ISSUES - PENALTY PHASE

### XXVIII
### AGGRAVATED KIDNAPPING SENTENCE VIOLATED
### BLAKELY V. WASHINGTON

Mr. Martinez's aggravated sentence of 20 consecutive years on the kidnapping

charge was imposed in violation of  Blakely v. Washington, 542 U.S. 296 (2004), as it

was based, in part, on aggravators not found by the jury.  (ROA 382.)  It was also based,

in part, on other aggravators that were found by the jury in relation to the killing, not the

kidnapping.  The jury found that the killing was motivated by pecuniary gain and that the

killing was cruel, heinous or depraved.  There was no such finding that the kidnapping

was motivated by pecuniary gain or that the kidnapping was cruel, heinous or depraved.

# DIRECT APPEAL ISSUES - ISSUES RAISED TO AVOID CLAIMS PRECLUSION

## XXIX
### THE REASONABLE DOUBT INSTRUCTION OF *STATE V. PORTILLO* DILUTES AND SHIFTS THE BURDEN OF PROOF

The reasonable doubt instruction of *State v. Portillo*, 182 Ariz. 592 (1995), dilutes and shifts the burden of proof in violation.  Rejected in *State v. Ellison*, 140 P.3d 899 (2006).

## XXX
### THE F5 PECUNIARY GAIN AGGRAVATOR IS UNCONSTITUTIONALLY OVERBROAD

The F(5) pecuniary gain aggravator is unconstitutionally overbroad and fails to narrow in violation of  *Arave v. Creech*, 507 U.S. 463 (1993) and U.S. CONST. amend. VIII.

## XXXI
### THE F6 CRUEL, HEINOUS AND DEPRAVED AGGRAVATOR IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD

The F(6) cruel, heinous and depraved aggravator is unconstitutionally vague and overbroad because the jury does not have enough experience or guidance to determine when the aggravator is met.

1

**XXXII**
**CONSECUTIVE SENTENCES FOR THE FELONY MURDER**
**CONVICTION AND THE UNDERLYING FELONY OF**
**KIDNAPPING VIOLATE DOUBLE JEOPARDY**

2

3

The *Blockburger v. United States*, 284 U.S. 299, 304 (1932), test for double

4

jeopardy is simple – sentences for lesser-included sentences cannot be stacked.[1]

5

*Iannelli* v. *United States,* 420 U.S. 770, 785 n.17 (1975) ("In determining whether

6

separate punishment might be imposed, *Blockburger* requires that courts examine

7

the offenses to ascertain whether each provision requires proof of a fact which the

8

other does not.").  Predicate felonies underlying a felony-murder conviction are

9

lesser-included offenses.[2]  The sentencing court stacked the sentences for the

10

underlying predicate felonies on top of the sentence for the felony-murder.  The

11

Arizona Court of Appeals addressed this issue on direct appeal following

12

resentencing.  *State v. Martinez*, 218 Ariz. 421, 439 (2008).

13

Consecutive sentences for felony-murder and the underlying felony are

14

contrary to clearly established United States Supreme Court caselaw.  *Jones v.*

15

_____

16

[1] *Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("the test to be applied to
determine whether there are two offenses or only one, is whether each provision
requires proof of a fact which the other does not.").

17

18

[2] *State v. Lopez*, 158 Ariz. 258, 264 (1988) ("Because the evidence did not support
the armed robbery charge, the trial court should have granted defendant's motion
for acquittal as to it. Because the offense of theft, which was supported by the
evidence, is not a predicate felony for felony murder under A.R.S. § 13-1105(A)
(2), the trial court also should have granted a judgment of acquittal with respect to
the felony murder theory.").

19

20

21

*Thomas*, 491 U.S. 376, 381 (1989) ("respondent's initial conviction and sentence for both felony murder and the underlying felony violated the third aspect of the Double Jeopardy Clause, the protection against 'multiple punishments for the same offense' imposed in a single proceeding."); *Whalen v. United States*, 445 U.S. 684 (1980) (holding that the crime of rape is a lesser included offense of the crime of felony murder in the perpetration of rape, and that since the latter crime included all of the elements of the former, consecutive sentences were therefore improper); *Harris v. Oklahoma*, 433 U.S. 682 (1977) ("Where petitioner had been convicted of felony-murder based on his companion's killing of a victim during the course of an armed robbery, the Double Jeopardy Clause of the Fifth Amendment barred a separate prosecution of petitioner for the lesser crime of robbery with firearms, since conviction of the greater crime of murder could not be had without conviction of the lesser crime.").

Consecutive sentences for lesser-included offenses involves an unreasonable application of *Blockburger* under any standard of unreasonableness. Consecutive sentences for lesser-included offenses is exactly what *Blockburger* prohibits. Arizona has split from every other jurisdiction to consider the issue. *State v. Contreras*, 120 N.M. 486 (1995) ("The majority of our sister states that have addressed this issue have held that one cannot be convicted of both felony murder and the predicate felony. See, e.g., *Connolly v. State*, 539 So. 2d 436, 441 (Ala. Crim. App. 1988) (felony murder and robbery); *Richie v. State*, 298 Ark. 358, 767

S.W.2d 522, 524 (Ark. 1989) (same); *Harling v. United States*, 460 A.2d 571, 572-73 (D.C. 1983) (same); *Tarpkin v. State*, 236 Ga. 67, 222 S.E.2d 364, 368 (Ga. 1976) (same); *Sivak v. State*, 112 Idaho 197, 731 P.2d 192, 206 (Idaho 1986) (same); *Williams v. State*, 426 N.E.2d 662, 670 (Ind. 1981) (same); *State ex rel. Wikberg v. Henderson*, 292 So. 2d 505, 509 (La. 1974) (felony murder and attempted robbery); *Newton v. State*, 280 Md. 260, 373 A.2d 262, 266 (Md. 1977) (same); *Shabazz v. Commonwealth*, 387 Mass. 291, 439 N.E.2d 760, 762 (Mass. 1982) (felony murder and robbery); *People v. Wilder*, 411 Mich. 328, 308 N.W.2d 112, 116 (Mich. 1981) (same); *State v. Hodges*, 384 N.W.2d 175, 183 (Minn. Ct. App.) (same); *Meeks v. State*, 604 So. 2d 748, 753 (Miss. 1992) (felony murder and kidnapping); *State v. Hubbard*, 123 N.J. Super. 345, 303 A.2d 87, 90 (N.J. Super. Ct. App. Div.) (felony murder and robbery); *People v. Castillo*, 178 A.D.2d 113, 576 N.Y.S.2d 855, 856 (N.Y. App. Div. 1991) (felony murder and kidnapping), appeal denied, 594 N.E.2d 947 (N.Y. 1992); *State v. Thompson*, 280 N.C. 202, 185 S.E.2d 666, 675 (N.C. 1972) (felony murder and breaking and entering); *Perry v. State*, 764 P.2d 892, 898 (Okla. Crim. App. 1988) (felony murder and robbery); *State v. Tucker*, 315 Ore. 321, 845 P.2d 904, 911 (Or. 1993) (in banc) (same); *Commonwealth v. Tarver*, 493 Pa. 320, 426 A.2d 569, 570 (Pa. 1981) (same); *State v. Powers*, 526 A.2d 489, 495 (R.I. 1987) (same); *Ex parte Jewel*, 535 S.W.2d 362, 365 (Tex. Crim. App. 1976) (same); *State v. Julius*, 185 W. Va. 422, 408 S.E.2d 1, 12-13 (W. Va. 199 1) (felony murder and arson); *State v. Gordon*, 111 Wis. 2d 133,

330 N.W.2d 564, 570 (Wis. 1983) (felony murder and kidnapping); *Cook v. State*, 841 P.2d 1345, 1352 (Wyo. 1992) (felony murder and robbery); *State v. Hoffman*, 227 Neb. 131, 416 N.W.2d 231, 241 (Neb. 1987) (defendant could not be convicted of vehicular homicide and drunk driving when drunk driving was predicate offense to vehicular homicide).")

## REQUEST FOR APPOINTMENT OF COUNSEL

Mr. Martinez is indigent and has substantially no assets.  Mr. Martinez's Application to Proceed In Forma Pauperis is attached along with a copy of his ADOC Inmate Account Summary reflecting an account balance of $14.81.  He has no training in law and is unable to represent himself.  Mr. Martinez requests that this Court issue a stay of his execution and appoint counsel to represent him in his capital case in this Court.

Mr. Martinez also requests that the Court grant counsel, after appointment, sufficient time to amend this petition after his entire record is reviewed and proper investigation is conducted to ensure that all of his federal constitutional issues are raised.

WHEREFORE, Mr. Martinez respectfully requests the following relief:

1.  Appointment of counsel to represent me in my Petition for Writ of Habeas Corpus and adequate time to allow counsel to properly review and investigate my case and raise all federal constitutional claims arising in his case;

2.  An order staying execution;

1    3. Release from confinement based on my unconstitutional conviction and

2  sentence;

3    4. Such other and further relief as the Court deems just and proper.

4    I declare under penalty of perjury that the foregoing is true and correct.

5    Dated February 12, 2021

6

7    Cody James Martinez
     Petitioner

8
     s/S. Jonathan Young
9    S. JONATHAN YOUNG
     LAW OFFICES OF WILLIAMSON & YOUNG, P.C.
10   Attorney for Defendant

11   s/Erin M. Carrillo
     ERIN M. CARRILLO
12   The Carrillo Law Firm, PLLC
     Attorney for Defendant

13

14  Copies of the foregoing
    served electronically or by other
15  means on ___April 13, 2021_____, to:

16  Lacey Stover Gard
    Chief Counsel
17  Capital Litigation Section
    400 West Congress, Bldg. S–215
18  Tucson, Arizona 85701–1367

19

20

21